IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


BRAD PEACOCK,                        )        CASE NO.  1:20-cv-01580
                                     )
            Plaintiff,               )        MAGISTRATE JUDGE
                                     )        KATHLEEN B. BURKE
      v.                             )
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )        **<u>MEMORANDUM OPINION & ORDER</u>**
            Defendant.               )


Plaintiff Brad Peacock ("Plaintiff" or "Peacock") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 14.

For the reasons explained herein, the Court finds that the ALJ either overlooked or

misconstrued evidence relating to Peacock's subjective allegations of pain and, without a more

thorough analysis, the Court is unable to determine whether the ALJ's assessment of Peacock's

subjective allegations regarding his pain and/or the decision finding Peacock not disabled are

supported by substantial evidence.  Accordingly, the Commissioner's decision is **REVERSED**

**AND REMANDED** for further proceedings consistent with this opinion and order.

## I.  Procedural History

On September 1, 2017, Peacock protectively filed an application for disability insurance benefits.[1]  Tr. 38, 107, 198-199.  Peacock alleged a disability onset date of June 23, 2016.  Tr. 38, 198.  He alleged disability due to spondylolisthesis, status post three lumbar surgeries (2009, 2014, and 2016); failed 2009 fusion surgery; hardware removal surgery 2014; chronic back spasms; status post ablations and injections; frequent position changes; significant difficulty sitting; and chronic severe pain.  Tr. 91, 126, 134, 213.  There were also allegations of mental health impairments.  Tr. 41, 98, 112.

After initial denial by the state agency (Tr. 125-132) and denial upon reconsideration (Tr. 134-140), Peacock requested a hearing (Tr. 141-142).  A hearing was held before an Administrative Law Judge ("ALJ") on June 25, 2019.  Tr. 52-81.  On July 22, 2019, the ALJ issued an unfavorable decision (Tr. 35-51), finding that Peacock had not been under a disability, as defined in the Social Security Act, from June 23, 2016, through the date of the decision (Tr. 39, 45).  Peacock requested review of the ALJ's decision by the Appeals Council.  Tr. 194-197.  On May 13, 2020, the Appeals Council denied Peacock's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence[2]

**A.     Personal, vocational and educational evidence**

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/27/2021).

[2] Peacock's appeal relates to the ALJ's evaluation of his back pain.  Doc. 16.  Thus, the evidence summarized herein is generally limited to evidence relating thereto.

Peacock was born in 1967 and was 51 years old at the time of the hearing.  Tr. 59, 198. Peacock has at least a college degree and had prior work history as an outside sales representative.  Tr. 59, 64-65.  Peacock last worked in June 2016.  Tr. 213, 424.

**B.     Medical evidence**

**1.     Treatment history**

Peacock has a history of treatment for back pain, including three back surgeries.  Tr. 63. Peacock's first back surgery was a fusion at the L5-S1 in July 2009.  Tr. 848.  On October 15, 2014, Peacock saw Dr. Orr, a spine surgeon at the Cleveland Clinic, for a consultation regarding his low back pain.  Tr. 848.  During that consultation, Peacock relayed that, following his surgery in 2009 he initially had good relief, but he complained to Dr. Orr of "progressively increasing axial back pain[]," with the pain worse on the right and associated spasms.  Tr. 848. Peacock described his pain as concentrated over the left lumbar paraspinals, burning and sometimes sharp and it was worsened by sitting or standing still; his pain improved with movement but his pain prevented him from performing his normal activities.  Tr. 848.  Peacock had recently had significant relief from an L3-4 and L4-5 facet injection.  Tr. 848.  He was taking tramadol as needed with some relief.  Tr. 848.  Dr. Orr reviewed imaging, noting that it showed "a solid arthrodesis[3] L5-S1.  The right sided L5 screw violates the L4-5 facet joint." Tr. 848.  Dr. Orr also noted that Peacock had "hypermobility at this level as evidenced by retrolisthesis with extension."  Tr. 848.  Dr. Orr discussed two surgical options – hardware removal or extension of the fusion at the L4-5.  Tr. 848.  Peacock elected to proceed with hardware removal.  Tr. 848.

---

[3] A joint fusion surgery is also referred to as arthrodesis.  https://www.webmd.com/osteoarthritis/guide/joint-fusion-surgery (last visited 9/27/2021).

Dr. Orr performed Peacock's hardware removal surgery on November 6, 2014.  Tr. 862-863.  During a six-week post-surgical visit with Dr. Orr, although Peacock's surgical pain was somewhat improved, he was still having some axial back pain.  Tr. 855.  Dr. Orr was not sure whether Peacock's axial pain was due to degeneration of the facets or impingement on the facet joint from the screw.  Tr. 855.  Dr. Orr wanted Peacock to start a flexion-based core strengthening exercise program.  Tr. 855.

On September 8, 2015, Peacock saw Dr. Mayer, in the spine department at the Cleveland Clinic, for a follow-up visit regarding his chronic low back pain.  Tr. 274.  Peacock reported feeling worse since his last visit in February 2015.  Tr. 274.  Peacock rated his pain a 5 out of 10.  Tr. 274.  Peacock's back pain was aggravated with sitting.  Tr. 274.  His pain was intermittent and achy and felt like a muscle pull.  Tr. 274.  Peacock indicated that certain things, e.g., massage and swimming, helped alleviate his pain but with short lasting effects.  Tr. 274.  He was still taking tramadol and Norco intermittently.  Tr. 274.  On physical examination, Peacock's spine range of motion was normal; his muscular strength was intact; his reflexes were normal and symmetric; he had good flexion and extension in his back; and straight leg raise test was negative.  Tr. 276.  Dr. Mayer reviewed results of a June 2015 lumbar spine MRI, noting that it showed normal alignment, no fracture, no new disk bulge or prolapse, no foraminal narrowing, and some degree of facet hypertrophy in the lower spine.  Tr. 277.  Dr. Mayer's assessment was midline low back pain without sciatica, myalgia, and lumbosacral facet joint syndrome.  Tr. 277.  Dr. Mayer discussed possible medial branch block at L3 and L4 bilaterally.  Tr. 277.  Prior to proceeding with the blocks, Peacock was interested in meeting with another physician at the Cleveland Clinic, Dr. Steinmetz, regarding possible surgery for his ongoing chronic pain.  Tr. 277, 284.

Peacock saw Dr. Steinmetz on September 21, 2015.  Tr. 284-286.  Peacock reported having back pain along with an inability to sit.  Tr. 284.  He reported some pain in his thighs but no radiating pain in his legs, no numbness or tingling, and no gait difficulties.  Tr. 284.  Physical examination findings were normal except Peacock exhibited significant pain with extension of his lumbar spine.  Tr. 285.  Dr. Steinmetz reviewed the current imaging and did not see a cause for Peacock's low back pain but he commented that in the past he had seen instances where an interbody fusion has fractured during removal of hardware.  Tr. 285.  Thus, Dr. Steinmetz felt it would be worthwhile to get a CT scan to assess it.  Tr. 285.  Dr. Steinmetz indicated that, if the CT scan was normal, he would recommend an L4-5 facet medical branch block bilaterally and, if that was effective, then radiofrequency ablation ("RFA").  Tr. 285.  Dr. Steinmetz did not see the need for surgery.  Tr. 285.

On October 21, 2015, Dr. Mayer administered a bilateral L4-5 lumbar facet injection.  Tr. 291.  At a follow-up visit on November 10, 2015, with a physician assistant Karen Bond, Peacock reported that, following his injection, he had "excellent (80%) relief of low back pain when standing, and 50% relief with sitting."  Tr. 298.  However, "[a]fter 24 hours, [his] pre-injection pain returned."  Tr. 298.  Peacock relayed that he could not drive, travel by airplane, or work because he was unable to tolerate sitting due to his low back pain.  Tr. 298.  Peacock's wife decided to stop working so she could be Peacock's caretaker and driver.  Tr. 298.  Peacock was ready to apply for disability.  Tr. 298.  He reported suicidal ideation due to pain but no intent, means, or plan.  Tr. 298.  Ms. Bond planned to follow up with Dr. Steinmetz to determine whether there had been any change relative to his opinion that surgery did not make sense.  Tr. 299.  If surgery was not an option, Ms. Bond noted that they would pursue RFA, with the possibility that insurance would require a MBB (medial branch block) prior to RFA.  Tr. 299.

On November 11, 2015, Peacock saw Dr. Gurley at The Cleveland Spine Institute for evaluation.  Tr. 388-391.  Peacock's chief complaint was chronic lumbosacral back pain radiating into the gluteal regions bilaterally.  Tr. 388.  Peacock relayed that his symptoms were usually worse with sitting, standing, sleeping, lifting, twisting, and walking and he was able to get some relief through use of heat, swimming, walking, and activity modification.  Tr. 388.  Dr. Gurley's impression was status post lumbar decompression and fusion L5-S1, lumbar spondylosis L3-4 and L4-5, chronic residual lumbago, and rule out symptomatic pseudarthrosis L5-S1.[4]  Tr. 390.  Prior to providing further treatment recommendations, Dr. Gurley recommended a high-resolution CT scan of the lumbar spine to allow him to establish the integrity of the fusion at the L5-S1 level because Dr. Gurley felt that it was equivocal based on the x-ray, MRI and standard CT.  Tr. 391.  Dr. Gurley also felt that the high-resolution CT would provide diagnostic information regarding the integrity of the "facet joints and pars at the L3-4 and L4-5 levels."  Tr. 391.

On December 1, 2015, Dr. Schaefer, a surgeon with the Cleveland Clinic, administered bilateral medial branch blocks at L4-5, L5-S1, and S1-S2.  Tr. 304.  Dr. Schaefer instructed Peacock to keep his appointment that was scheduled with Dr. Goyal for RFA.  Tr. 305.

Peacock returned to see Dr. Gurley on January 7, 2016, to review the results of the diagnostic studies.  Tr. 385.  Dr. Gurley felt that if a surgical route was taken, his "recommendation would be a revision AP fusion at the L5-S1 level."  Tr. 386.  However, prior to proceeding with surgery, Dr. Gurley recommended that Peacock try to maximize his nonoperative treatment.  Tr. 387.  In furtherance of that effort, Dr. Gurley referred Peacock to a

---

[4] "Pseudarthrosis is the result of failed attempted spinal fusion." https://pubmed ncbi.nlm.nih.gov/19652031/ (last visited 9/27/2021).

pain management program, noting that Peacock might benefit from bilateral facet blocks at the L3-4, L4-5, and L5-S1 levels.  Tr. 387.

On January 25, 2016, Peacock saw Dr. Fouad at Comprehensive Pain Management Specialists for a pain management consultation.  Tr. 335-338.  Peacock rated his worst pain as an 8, his best pain as a 0, and his average pain as a 5.  Tr. 335.  Peacock relayed that standing or sitting for a long time in the same position made his pain worse while standing and movement helped alleviate his pain.  Tr. 335, 337.  With the exception of "tenderness [in the] paravertebral muscles facet loading left right" and trigger points present in paravertebral bilaterally, physical examination findings were unremarkable or normal.  Tr. 336-337.  Dr. Fouad's assessment was spondylosis without myelopathy or radiculopathy, lumbosacral region; other intervertebral disc disorders, lumbar region; and chronic pain syndrome.  Tr. 337.  Dr. Fouad scheduled Peacock for bilateral facet blocks at L3, 4, and 5.  Tr. 337.  Dr. Fouad also noted that Peacock was scheduled for L3-4 and L4-5 discogram in February and he encouraged Peacock to stay active.  Tr. 338.

On February 25, 2016, Dr. Fouad performed the bilateral facet blocks at L3, 4, 5.  Tr. 332-333.  Peacock saw Dr. Fouad for follow up on March 11, 2016.  Tr. 328-331.  Peacock indicated that he had recently been diagnosed with fibromyalgia.  Tr. 328.  Peacock relayed that he had "great relief for a few hours" from his lumbar facets on February 25, 2016, but his pain had returned.  Tr. 328.  He also reported greater than 80 percent relief following his lumbar facets that lasted one to five days.  Tr. 328.  On physical examination, there was "tenderness [in the] paravertebral muscles facet loading left right positive bilaterally"; moderately limited range of motion in the lumbar spine with flexion; and trigger points were present in paravertebral bilaterally.  Tr. 329.  Otherwise, physical examination findings were unremarkable or normal.

Tr. 328-329.  Based on the reported relief received from the blocks, Dr. Fouad scheduled Peacock for "bilateral lumbar facet MB RFA L2,3,4."  Tr. 330.

On April 26, 2016, Dr. Fouad performed another round of bilateral facet injections at L3, 4, 5.  Tr. 324-325.  Then, on May 12, 2016, Dr. Fouad performed RFA of the lumbar facet medial branch nerves.  Tr. 322-323.

Peacock saw Dr. Drummond at Comprehensive Pain Management Specialists on May 31, 2016.  Tr. 318-321.  Peacock reported 50 percent relief from the facet injections for less than one day and no relief from the RFA.  Tr. 318.  Peacock complained of back pain, rating his pain a 5 out of 10.  Tr. 318.  He reported no side effects from his medications.  Tr. 318.  Peacock reported improvement in his pain while using a TENS unit, which he used three to six days per week for eight or more hours at a time.  Tr. 318.  Physical examination findings showed "tenderness paravertebral muscles bilateral, midline tenderness[]"; moderately limited range of motion in the lumbar spine with flexion, and "[d]iminished sensation to light touch in the bilateral gluteus."  Tr. 320.  Otherwise, examination findings were unremarkable or normal.  Tr. 320.  Dr. Drummond refilled Peacock's Norco and started him on gabapentin.  Tr. 321.  Peacock was scheduled to follow up with Dr. Gurley and a possible L3-4 and L4-5 discogram.  Tr. 321.  Peacock was encouraged to stay active and to follow up with Dr. Fouad in four weeks.  Tr. 321.

Peacock saw Dr. Gurley for follow up on June 8, 2016.  Tr. 382-384.  Peacock continued to have pain in his back and bilateral buttocks pain symptoms.  Tr. 382.  His symptoms were worse when engaged in activities, especially driving, lifting, bending, and twisting.  Tr. 382.  Peacock explained that, after leaving his house and backing out his car to the end of the driveway, he had to get out of his car before being able to continue.  Tr. 382.  On average Peacock rated his pain between a 3 and 6 out of 10, with his best pain being a 1 out of 10 and his

worst a 10 out of 10.  Tr. 382.  Peacock was experiencing more bad days than good.  Tr. 382.
Dr. Gurley indicated that Peacock's high resolution CT scan confirmed "an established
pseudarthrosis at the L5-S1 level."  Tr. 383.  Dr. Gurley recommended an updated MRI and a
series of standing dynamic lumbar x-rays.  Tr. 383-384.

Lumbar x-rays and a lumbar MRI were performed on June 17, 2016.  Tr. 405-407.  The
impression was "[p]ostoperative changes from left laminectomy at L5-S1.  No evidence of
granulation tissue and there are no imaging findings to suggest arachnoiditis[]" and "[m]ild
degenerative changes of the lumbar spine as detailed . . . without spinal canal or neural foraminal
narrowing at any level.  There is a slight anterior wedging of the T12 vertebral body, likely
chronic in etiology."  Tr. 406.  The lumbar x-rays showed "[p]ostsurgical and degenerative
changes at L5-S1.  Grade 1 spondylolisthesis at L3-L4 and L4-L5 without significant
movement."  Tr. 407.

On June 27, 2016, Peacock saw Dr. Fouad regarding his back pain.  Tr. 315-317.
Peacock indicated that bending, standing or sitting for a long time, and going up and down steps
made his pain worse.  Tr. 315.  Medications and rest helped alleviate his pain.  Tr. 315.  Peacock
continued to report improvement in his back pain while using a TENS unit.  Tr. 315.  Peacock
stood throughout the entirety of the office visit.  Tr. 315.  Physical examination findings were
similar to Peacock's prior pain management visit.  Tr. 316.  Dr Fouad refilled Peacock's Norco.
Tr. 317.  The gabapentin was discontinued because it was not helping.  Tr. 317.  Peacock was
encouraged to stay active.  Tr. 317.

Peacock returned to see Dr. Gurley on July 7, 2016, to review the results of his diagnostic
studies.  Tr. 379.  Dr. Gurley's impression was lumbar spondylosis L3-4 and L4-5, status post
lumbar decompression L4-5 and L5-S1, right foraminal stenosis L5-S1, and pseudoarthrosis L5-

S1.  Tr. 380.  Dr. Gurley discussed operative and non-operative options.  Tr. 380.  Peacock felt

he was "no longer able or willing to live with [the] pain or functional limitations."  Tr. 380.

Prior to proceeding with surgery, Dr. Gurley recommended lumbar a discography at the L3-4 and

L4-5 levels to ensure the validity of his surgical recommendation which consisted of revising

Peacock's fusion at the L5-S1 level and extending the fusion to the L4-5 level.  Tr. 380.

After having the discography performed, Peacock saw Dr. Gurley on September 16,

2016.  Tr. 376.  Dr. Gurley indicated that the discography at the L3-4 and L4-5 showed

"abnormally nuclear morphology an[d] acute concordant discogenic back pain which was

reversed with lidocaine reversal testing."  Tr. 376.  The injection therapy, however, did not

provide "any significant or sustained improvement in his symptoms."  Tr. 376.  Rather, Peacock

was reporting "progressive back pain and declining function."  Tr. 376.  On average, Peacock

rated his pain between a 4 and 5 out of 10, with his best pain being a 0 out of 10 and his worst a

8 out of 10.  Tr. 376.  "From a pain and functional standpoint [Peacock] [felt] that he [was]

experiencing more bad days [than] good days."  Tr. 376.

Peacock saw Dr. Gurley on October 13, 2016, for a preoperative surgical visit.  Tr. 374-

375.  Dr. Gurley's surgical recommendation was an anterior-posterior spine fusion from L3 to

S1.  Tr. 375.  Following a discussion of the risks and benefits associated with the surgery,

Peacock indicated he wanted to proceed with surgery as planned.  Tr. 375.

On November 14, 2016, Peacock underwent lumbar surgery, i.e., a revision AP fusion

from L3 to S1, performed by Dr. Gurley and co-surgeon, Dr. Rogers.  Tr. 372, 392-393.  At

Peacock's two-week postoperative visit, Dr. Gurley noted that "from a pain and functional

standpoint [Peacock] [had] achieved a[nd] maintained a reasonably good early clinical outcome."

Tr. 372.  Peacock was still having postoperative pain, primarily at the L5-S1 level.  Tr. 372.  Dr.

Gurley felt that the diagnostic studies showed that the fusions were consolidating well.  Tr. 372.
Dr. Gurley instructed Peacock "to continue full-time external brace immobilization and activity
restrictions as previously prescribed."  Tr. 373.  However, Dr. Gurley "encouraged [Peacock] to
gradually increase his ambulatory activities for early general fitness and conditioning."  Tr. 373.

At a January 4, 2017, postoperative visit with Dr. Gurley, Peacock reported moderate
improvement in his pain and function but he was having residual back and buttocks pain
symptoms.  Tr. 370.  Peacock relayed that he felt that he was having more good days than bad
days and he reported no residual radicular leg symptoms.  Tr. 370.  Dr. Gurley again instructed
Peacock "to continue full-time external brace immobilization and activity restrictions as
previously prescribed[]" and also "encouraged [Peacock] to gradually increase his ambulatory
activities[.]" Tr. 371.

At Peacock's February 22, 2017, follow-up visit, Dr. Gurley noted there was
improvement in Peacock's pain and with his standing, sitting, and ambulatory endurance.  Tr.
368.  However, Peacock was still significantly limited from the standpoint of sitting tolerance.
Tr. 368.  Peacock relayed that his pain level was dependent upon his level of activity and his pain
was especially worsened by prolonged sitting.  Tr. 368.  Peacock reported that he could not sit
for longer than 20-30 minutes before needing to stand or walk or change positions.  Tr. 368.  Not
considering Peacock's sitting activities, he was having more good days than bad days.  Tr. 368.
Dr. Gurley continued to note that diagnostic studies showed that the fusions were consolidating
well.  Tr. 368.  Dr. Gurley discontinued external bracing mobilization and prescribed physical
therapy.  Tr. 369.

Peacock saw Dr. Ryan with Southwest General Medical's pain management program on
August 3, 2017, regarding his back pain.  Tr. 343-346, 364.  Peacock relayed that his pain was

located in the upper thoracic spine without radiation into his legs.  Tr. 343.  Peacock reported no

sensory loss and no weakness.  Tr. 343.  Activity made Peacock's pain worse.  Tr. 343.  Peacock

reported significant improvement with respect to his low back pain following his surgery in

November 2016.  Tr. 343.  However, he was having significant and severe pain in the thoracic

area above the level of his fusion.  Tr. 343.  Peacock indicated that physical therapy was not

providing much relief.  Tr. 343.  Peacock had not recently tried using a TENS unit for the

problem.  Tr. 343.  He reported taking "a fairly modest amount of pain medication for the worst

of his symptoms."  Tr. 343.  He had some Norco left over from a prior prescription and would

take a half a Norco pill with two Naprosyn and he also found that muscle relaxers could help.

Tr. 343-344.  Peacock felt that tramadol was sedating.  Tr. 344.  Dr. Gurley had prescribed

Percocet but Peacock was not taking it.  Tr.  344.  Dr. Ryan's assessment was lumbar post-

laminectomy syndrome, spasm of thoracic back muscle, and thoracic spondylosis.  Tr. 345-346.

Recommendations included physical therapy, use of TENS unit, possible medial branch blocks,

and a thoracic spine MRI to verify no compression fracture or herniated disc.  Tr. 345-346.  Dr.

Ryan also provided Peacock with a refill of Flexeril.  Tr. 346.

Peacock saw Dr. Gurley for follow up on August 15, 2017.  Tr. 364.  Dr. Gurley noted

that Peacock was seeing Dr. Ryan for pain management.  Tr. 364.  Peacock relayed that

"[o]verall, he consider[ed] himself to be approximately 50% [improved] compared to his

preoperative level of pain and function."  Tr. 364.  Dr. Gurley recommended that Peacock

continue with activities as tolerated and he encouraged Peacock to maintain some level of

general fitness and conditioning.  Tr. 365.  Lumbar spine x-rays taken on August 15, 2017,

showed "[n]o acute abnormalities[]" and "[s]table remote postsurgical and multilevel

degenerative changes."  Tr. 400, 648.

Peacock saw Dr. Ryan again on September 28, 2017, with complaints of pain in the thoracic region that radiated to the upper thoracic and lumbar region.  Tr. 347-351.  Peacock indicated that his thoracic pain was constant; it was worse with sitting and walking and activity made the pain better.  Tr. 347.  Dr. Ryan noted that the thoracic MRI showed a nonacute compression fracture at the T11 level with minimal loss of height and some annular displacement at the T6-T9 level without evidence of frank disc herniation or canal stenosis.  Tr. 348, 349.  Recommendations included non-opiate pain medications, TENS unit (which Peacock indicated helped with the spasms in his thoracic back muscles), and possible thoracic medial branch blocks.  Tr. 350.  Dr. Ryan noted that, while the TENS unit was helping with Peacock's pain, it was not controlling "the worst of his pain which [was] severe and debilitating and preventing [Peacock] from working."  Tr. 351.

One year following his surgery, Peacock saw Dr. Gurley for follow-up on November 16, 2017.  Tr. 362-363.  Dr. Gurley noted that "[f]rom a pain and functional standpoint [Peacock] [had] achieved some improvement.  [Peacock] did continue to experience pain in the thoracolumbar, lumbar, lumbosacral regions[]" and Peacock "described significant limitations in his ability to sit for any sustained period of time indicating his maximal tolerance[] [was] approximately two hours."  Tr. 362.  Peacock described his pain as moderately severe.  Tr. 362.  On average, Peacock said his pain rated a 4 to 5 out of 10.  Tr. 362.  Peacock was having more good days than bad days, which, Dr. Gurley noted was "a significant improvement over his preoperative pain and function level.  Tr. 362.  Dr. Gurley indicated that Peacock's thoracic MRI

scan included findings "consistent with a diagnosis of Sherman's disease[5] in the lower thoracic region." Tr. 363.  Dr. Gurley recommended a FCE (functional capacity evaluation). Tr. 363.

The FCE was performed on March 20, 2018.[6]  Tr. 424-429.  During the FCE, Peacock had an excessively elevated heart rate (174) but appeared to be in no distress. Tr. 424-425.  Peacock relayed that that he had the problem in the past but without symptoms.  Tr. 425.  It was recommended that Peacock follow up with his physician.  Tr. 424-425, 429.  Upon that recommendation, Peacock sought emergency room treatment the next day.  Tr. 431.  While at the emergency room, Peacock reported that he had been at physical therapy that day and the heart monitor read 170 but he was asymptomatic.  Tr. 431.  Also, Peacock relayed that he had been at the gym that day and the exercise equipment monitor read 140.  Tr. 431.  Peacock was asymptomatic and denied associated symptoms, e.g., no dizziness, lightheadedness, shortness of breath, etc, or prior diagnosis of atrial fibrillation.  Tr. 431.  The impression was atrial fibrillation with rapid ventricular response.  Tr. 434.  The emergency room doctor recommended that Peacock be admitted but Peacock could not stay because there was no one to watch his children.  Tr. 434.  Following further discussion, Peacock was started on Cardizem and advised to follow up with cardiology to schedule an echocardiogram.  Tr. 434.  Peacock was discharged home in improved condition.  Tr. 434.

On March 23, 2018, Peacock followed up with a cardiologist at MetroHealth, Dr. Gandhi, who agreed with the recommendation for an echocardiogram and continuing with Cardizem.  Tr. 465, 468.  Dr. Gandhi also felt that a cardioversion procedure might be considered.  Tr. 468.

---

[5] "Scheuermann disease [also referred to as Sherman's disease] is characterized by lumbar or thoracic kyphosis or both, back pain, and a variety of vertebral changes including wedging, endplate irregularity, narrowing of disc spaces," . . . https://www.ncbi.nlm.nih.gov/medgen/19885 (last visited 9/27/2021).

[6] The results of the FCE are detailed in opinion evidence section below.

Peacock continued to follow up with cardiology and receive treatment through at least October 2018 for his atrial fibrillation.  Tr. 474, 494, 496, 498, 627, 814.

On July 19, 2018, Peacock saw Dr. Astley in the pain and healing department at MetroHealth regarding his back pain.  Tr. 612-615.  The "pain assessment" reflected that Peacock had the ability to stand for 10 minutes, sit for 5 minutes, and walk for 15 minutes.  Tr. 613.  Peacock's then current pain level was 4 out of 10, with his pain ranging between a 1 out of 10 and 7 out of 10.  Tr. 613.  Peacock reported having problems sleeping due to pain.  Tr. 613.  Peacock relayed he had lower lumbar pain but his primary complaint was thoracic spine pain above the level of his fusion.  Tr. 614.  He also relayed that his back pain was worse with prolonged sitting but he was better with standing or moving or exercising.  Tr. 614.  On examination, lumbar extension was not painful but lumbar extension was moderately painful.  Tr. 615.  There was bilateral tenderness to palpation in the lumbar paravertebral region.  Tr. 615.  Reflexes, sensation, motor strength, fine motor coordination, and gait were normal.  Tr. 615.  Recommendations included pool and physical therapy and bilateral medial branch blocks at the T8-10 level, two to three times, followed by RFA if necessary.  Tr. 615.

Peacock saw Dr. Astley for follow up on August 1, 2018.[7]  Tr. 620-622.  Peacock reported that his pain was gradually worsening since his prior visit.  Tr. 620.  Peacock indicated that his pain was worsened with forward flexion, lateral flexion, and rotation.  Tr. 620.  He described his pain as "dull, intense, continuous and chronic[.]"  Tr. 620.  Dr. Astley recommended that Peacock proceed with the medial branch blocks in the thoracic spine soon and they briefly discussed RFA and a SCS (spinal cord stimulator).  Tr. 622.  Dr. Astley noted that

[7] Also, in August 2018, Peacock received treatment for right shoulder pain.  Tr. 930-931.  After testing and further evaluation, in October 2018, Peacock was informed that he would eventually need surgery for a tear in his right shoulder but there was no immediate need for the surgery and he was referred for further evaluation by Dr. Hedaya regarding his neck and any radicular symptoms.  Tr. 929.

Peacock was "doing exercises and moving well but sitting and laying are and have always been issues for [Peacock][.]"  Tr. 622.

Upon the recommendation of Peacock's physical therapist to have his hips checked, on September 26, 2018, Peacock saw Susan Krueger, a physician assistant at Metro Health, regarding "left hip 'tightness[.]'"  Tr. 639.  X-rays of the bilateral hips/pelvic were taken and Ms. Kruger's impression was bilateral hip osteoarthritis, mild, noting that Peacock was asymptomatic during the visit.  Tr. 641.  Ms. Krueger recommended over-the-counter acetaminophen and recommended that Peacock continue with physical therapy.  Tr. 641.

On October 23, 2018, Peacock saw Dr. Hedaya at Integrative Pain Care, LLC regarding his low back pain and shoulder pain.  Tr. 832-835.  Dr. Hedaya ordered MRIs of the thoracic and lumbar spine and x-rays of the thoracic and lumbar spine and shoulder.  Tr. 835.  Dr. Hedaya discussed the possibility of facet injections once the imaging was obtained.  Tr. 835.

Imaging ordered by Dr. Hedaya was taken on October 30, 2018.  Tr. 837-841.  The lumbar spine x-ray showed intact hardware, facet joint hypertrophy, and mild grade I anterolisthesis with disc space narrowing and degenerative endplate changes at the L5-S1 level.  Tr. 837.  The thoracic spine  x-ray showed mild degenerative changes.  Tr. 839.  The x-ray of the left shoulder showed some degenerative changes at the acromioclavicular joint.  Tr. 841.

Peacock continued to treat with Dr. Hedaya through 2018 and 2019.  Tr. 824, 826, 956.  On February 11, 2019, Dr. Hedaya administered a series of bilateral lumbar facet joint injections from L3 to S1.  Tr. 829-830.  Also, on May 16, 2019, Dr. Hedaya administered a series of bilateral lumbar facet joint injections from L3 to S1.  Tr. 955-957.  The following month, Dr. Hedaya performed a left lumbar RFA procedure at the L2-L5 level (Tr. 951-952) and right lumbar RFA procedure at the L2-L5 level (Tr. 980-981).

A July 3, 2019, lumbar spine MRI showed a bulging disc and facet hypertrophy at L2-3, status post-spinal fusion at L3-4 through L5-S1 with satisfactory postoperative appearance, mild bilateral foraminal stenosis at L4-5 and L5-S1, and no enhancing scar tissue.  Tr. 984-985.  A July 3, 2019, thoracic spine MRI showed a small left central herniation at T5-6, bulging discs at T6-7, T7-8, and T8-9, and nerve sleeve cyst in the foramen at T3-4.  Tr. 986-987.

## 2.  Opinion evidence

### a.  State agency reviewers

On December 13, 2017, state agency reviewing consultant Dr. Thomas completed a physical RFC assessment.  Tr. 100-104.  Dr. Thomas opined that Peacock had the RFC to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 4 hours; sit for a total of about 6 hours; and push and/or pull unlimitedly, except as indicated for lift and/or carry.  Tr. 101.  Dr. Thomas opined that Peacock could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and could frequently balance.  Tr. 101.  Also, Dr. Thomas opined that Peacock would need to avoid all exposure to hazards.  Tr. 102.  Dr. Thomas found that Peacock did not have manipulative, visual, or communicative limitations.  Tr. 102.

Upon reconsideration, on February 16, 2018, state agency reviewing consultant Dr. Klyop affirmed Dr. Thomas' RFC assessment.  Tr. 115-119.

### b.  Functional capacity evaluation

On March 20, 2018, Kurt Zillmann, P.T., performed the functional capacity evaluation (FCE) to determine Peacock's work capacity.  Tr. 424-429.  Peacock relayed that he first experienced back pain while in high school.  Tr. 424.  He had past skiing and lifting injuries.  Tr. 424.  Peacock relayed that his first back surgery was in 2009 and in 2014 he had to be driven

around while lying down in the back of the car.  Tr. 424.  Peacock described having burning pain across his low back with prolonged sitting and standing and felt better when he was moving.  Tr. 424.  During the FCE, Mr. Zillmann observed Peacock change positions frequently from sitting to standing.  Tr. 424.  Peacock rated his pain that date as a 4 out of 10 and estimated that, over the prior 30 days, his pain ranged from a 2 to 9 out of 10.  Tr. 424.

As part of the FCE testing, Peacock was required to sit for 30 minutes continuously but he was only able to sit for 15 minutes.  Tr. 425.  Also, while the FCE testing required 30 minutes of standing, Peacock was only able to stand for 20 minutes.  Tr. 425.  Mr. Zillmann noted that the primary reason for Peacock being unable to meet the sitting and standing minimums was due to his inability "to stay in position without increased pain or spasms."  Tr. 425.  Peacock was able to meet the 30-minute period of walking as required by the FCE testing.  Tr. 426.

Peacock was able to lift up to 40 pounds overhead on an occasional basis and carry up to 24 pounds on an occasional basis.  Tr. 428.  Peacock could not perform frequent or constant lifting because of bilateral knee pain, bicep pain, and right shoulder pain.  Tr. 428.  Mr. Zillmann indicated that Peacock could occasionally sit or stand, and could frequently walk, and could occasionally bend, reach, climb, squat, kneel and crawl.  Tr. 428.  Mr. Zillmann stated that due to all of Peacock's injuries, "he needs to move at will thus prolonged posturing and repetitive activities will exacerbate his pain and symptoms."  Tr. 428.

Mr. Zillmann further stated that Peacock was "unable to work in the traditional work environment due to his need to frequently change his postures and positions to manage his pain and muscle spasms."  Tr. 429.  Mr. Zillmann also indicated that Peacock could not "sit to drive long distances in his car for outside sales and would require significant work site accommodations with standing and sitting for returning to inside sales."  Tr. 429.  Peacock

relayed that it was his desire to return to some type of gainful employment. Tr. 429.  Mr. Zillmann commented that Peacock "may need vocational rehabilitation in some form to help with job placement." Tr. 429.

### c. Medical expert

On April 11, 2019, the ALJ requested that medical expert Dr. Clark provide her professional medical opinion in connection with Peacock's application for social security disability. Tr. 910.  In furtherance of that request, the ALJ submitted interrogatories to Dr. Clark along with evidence. Tr. 910.

Dr. Clark completed the interrogatories on April 20, 2019. Tr. 911-913.  Dr. Clark noted that Peacock's impairments included back pain and status post L5-S1 fusion (2009). Tr. 911. Dr. Clark opined that Peacock did not have an impairment or combination of impairments that met or equaled a listing. Tr. 912.  In reaching this conclusion, Dr. Clark indicated that she considered Listing 1.04 (Disorders of the Spine), noting "s/p lumbar fusion - healed"; there was no nerve root compromise, motor or sensory loss, arachnoiditis, or stenosis resulting in pseudoclaudication; and Peacock could ambulate effectively. Tr. 912.  In the interrogatories, Dr. Clark was also asked to identify any functional limitations or restrictions resulting from the impairments that she identified and to cite evidence supporting her opinion. Tr. 913.  Dr. Clark listed "decreased sitting, standing, walking, carrying, climbing, crawling, crouching[.]" Tr. 913. No specific evidence was cited in support of these limitations.

On April 20, 2019, Dr. Clark also completed a Medical Statement of Ability to do Work-Related Activities (Physical) ("Medical Statement"). Tr. 914-919.  In the Medical Statement, Dr. Clark opined that Peacock could frequently lift and/or carry up to 10 pounds and occasionally lift and/or carry up to 20 pounds. Tr. 914.  Dr. Clark opined that Peacock could sit, stand, or walk

for one hour at a time without interruption; sit for a total of eight hours in an eight-hour workday; and stand or walk for a total of one hour in an eight-hour workday.  Tr. 915.  Dr. Clark opined that Peacock could frequently reach, handle, finger, feel, and push/pull with his hands bilaterally and frequently operate foot controls with his feet bilaterally.  Tr. 916.  With respect to postural limitations, Dr. Clark opined that Peacock could never crawl or climb ladders or scaffolds and he could occasionally crouch, kneel, stoop, balance, or climb stairs and ramps.  Tr. 917.

In the Medical Statement, Dr. Clark also opined that Peacock could never be around unprotected heights; he could occasionally be around moving mechanical parts, humidity and wetness, extreme cold, extreme heat, and vibrations; he could frequently operate a motor vehicle; and he could be exposed to moderate noise. Tr. 918.  Additionally, Dr. Clark opined that Peacock could perform the following physical activities: shop; travel without assistance; ambulate without a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; climb steps at a reasonable pace with a single handrail; prepare a simple meal; handle his own hygiene; and sort, handle, and use paper files. Tr. 919.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Peacock was represented and testified at the hearing.  Tr.  59-72.  Peacock relayed that he had previously received long-term disability from his company but the benefits ceased in November 2018.  Tr. 62.

Peacock has no restrictions on his driver's license but he restricts the amount of driving he does because it is difficult for him to sit.[8]  Tr. 62.  Peacock explained that his biggest problem

---

[8] During the hearing, Peacock indicated that he might need to stand because he needed to frequently change positions.  Tr. 62-63.

was "frequent position change requirements[,]" meaning he could not "stand or sit in place for a very long period of time." Tr. 63.  As an example, Peacock indicated that his drive to the hearing was about a 25-minute drive and that was "about the limit of [his] ability before [he] need[ed] to get out of the car and move around." Tr. 63.  After a while, Peacock starts to get back spasms along with a burning sensation and pain.  Tr. 63.  Peacock has a foam roller that he uses while lying on the ground.  Tr. 63.  Peacock can walk about a half a mile to a mile but not consistently every day.  Tr. 66.  He can ride a bike but not easily and not very far because he has to bend over.  Tr. 66.

Peacock indicated that he had three back surgeries.  Tr. 63.  When asked to describe how his functioning was since his third back surgery, Peacock explained that his life had been more tolerable since the third surgery but that was as compared to previously not wanting to go on with his life because the pain was so intolerable.  Tr. 63.  Peacock stated: "From a functional standpoint, I feel like I've been evicted from my life in terms of hobbies, work.  I really just can't do any of those things." Tr. 63.  From previously not wanting to go on with his life, the surgery made things more tolerable but, from a functional standpoint, his situation had not improved.  Tr. 63-64.

With respect to his past work, Peacock explained that the title of "manager" was a little misleading because he did not directly manage employees.  Tr. 64.  He worked internally with inside salespeople who helped him with his outside sales and he would help manage their activities but he did not have direct reports.  Tr. 64.  Peacock explained that his responsibility was strictly outside sales and he worked in that role for 23 years.  Tr. 65.  In a typical week, Peacock was driving between 600 and 1,000 miles and he was engaged in face-to-face meetings

21

for about 12 to 15 hours per week and about 20 hours per week of computer-based work.  Tr. 64.
On average, he was on the road four days each week.  Tr. 65.

Peacock had an ablation procedure the day before the hearing and relayed that he had
also tried numerous injections.  Tr. 67.  The ALJ questioned Peacock about the apparent
inconsistency or difference between Peacock's testimony regarding the difficulty he has sitting
and standing for more than 15 to 20 minutes and treatment notes indicating that he had normal
tone and muscle strength in joints, bones and muscles; no contractures or misalignment,
tenderness or bony abnormalities; normal movement in all extremities; and no cyanosis or
edema.  Tr. 65-66.  In response, Peacock stated: "The challenge, I've always - - doctors have
always said, you have good strength, you walk well, to look at you, you look okay, but we
understand, you know, that there is pain internally.  So even going back when I first had surgery
and prior to that in 2009, I've always - - I've not had strength issues or tone issues."  Tr. 67.
Peacock relayed, "I've been carrying this pain for 20 years."  Tr. 67.  Peacock indicated he had
prescription pain medication that he took as prescribed.  Tr. 67-68.  As far as side effects,
Peacock relayed that any type of muscle relaxer or pain medication that he took made it very
difficult for him to be lucid and made him very tired, like he is in a fog.  Tr. 68.  If Peacock
knows he has to drive, e.g., if he knows he has to take one of his children to school or to a
practice, he does not take his pain medication.  Tr. 68-70.

Peacock relayed that he tried to work as long as he could and would continue to seek
treatment with the hope of being able to return to work.  Tr. 70-71.  Based on his doctors'
indications, Peacock did not feel that there was a light at the end of the tunnel but continued to
hope that there would be a way to get treatment that made things manageable.  Tr. 70-71.

### 2.    Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.[9]  Tr. 57-59, 72-79.  Initially, the ALJ referenced the 15-year work summary that the VE had completed wherein the VE identified the following prior work history for Peacock – software sales manager, manager of professional equipment, software sales representative, and outside sales representative.  Tr. 57-58, Tr. 270. The ALJ asked the VE to explain the difference between the software sales manager position and software sales representative position.  Tr. 58.  The VE indicated that the software sales manager position was a managerial position and the other would involve selling as a salesperson.  Tr. 58. The VE noted that if he had a little more detail about Peacock's past work he would likely be able to narrow down the past relevant work.  Tr. 58-59.  During his testimony, Peacock clarified that, while he held various titles, his responsibility for almost 23 years was outside sales.  Tr. 65.

The ALJ asked the VE to consider an individual of Peacock's age and with his education with the following RFC: ability to lift and carry 10 pounds frequently; lift and carry 20 pounds occasionally; push and pull 10 pounds frequently; push and pull 20 pounds occasionally; sit/stand/walk 6 hours out of an 8-hour workday; and a sit/stand option requiring the need to stand four times during the day in order to shift positions and move not far from the individual's worksite to relieve any pain and pressure for 3 minutes at a time during which time work could be performed.  Tr. 72-73.  The ALJ then asked the VE whether the described individual would be able to perform any of Peacock's past relevant work.  Tr. 73.  In response, the VE indicated that the described individual would be able to perform Peacock's past jobs at both light and sedentary levels as normally performed and as Peacock performed the jobs.  Tr. 73.

In response to questioning by Peacock's counsel, the VE indicated that Peacock's past relevant work would not be available if the individual described in the ALJ's hypothetical also

---

[9] The 15-year work summary is Exhibit 13E.  Tr. 57, 270.

could not perform occupational driving.  Tr. 75-76.  If the sit/stand option was amended to require a change in position every 30 minutes at a minimum and the occasional need to walk away from the worksite for 5 minutes, the VE indicated that, while such a restriction would eliminate many light level jobs, the job of outside software sales representative would remain available.  Tr. 76.  The VE explained that there was a great deal of leeway associated with the outside sales representative job.  Tr. 76.  For example, the VE explained that an individual could drive, stop and rest one time or four times and there is nothing "in the job description [saying] that [an individual] [has] to drive 35 minute[s] before [he] can stop[.]"  Tr. 76.  In response to further questioning by Peacock's counsel, the VE indicated that being off-task up to 10 percent of the time is acceptable but beyond that the VE could not say for certain whether there would be jobs available or not.  Tr. 76-79.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[10] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[10] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[11] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his July 22, 2019, decision the ALJ made the following findings:[12]

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[12] The ALJ's findings are summarized.

1.    Peacock meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 40.

2.    Peacock has not engaged in substantial gainful activity since June 23, 2016, the alleged onset date.  Tr. 40.

3.    Peacock has the following severe impairment: degenerative disc disease. Tr. 40. Peacock has the following non-severe impairments: atrial fibrillation, degenerative joint disease of the left shoulder, depression, and anxiety.  Tr. 41-42.

4.    Peacock does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 42.

5.    Peacock has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except he requires the ability to stand to shift positions to move not far from the worksite to alleviate pain and pressure four times per day at three minutes at a time.  Tr. 42-45.

6.    Peacock is capable of performing past relevant work as: software sales manager, professional equipment manager, software sales representative, and outside sales representative.  Tr. 45.

Based on the foregoing, the ALJ determined Peacock had not been under a disability, as defined in the Social Security Act, from June 23, 2016, through the date of the decision.  Tr. 45.

## V. Plaintiff's Arguments

Peacock asserts that the ALJ erred when assessing Peacock's pain, arguing that he misread the record.  Peacock also argues that the ALJ erred when reviewing the opinion evidence and concluding that the evidence supported a light RFC.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v.

Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.     Reversal and remand is warranted

Peacock asserts that the ALJ erred in assessing Peacock's pain due to a misreading of the

record.  Doc. 16, pp. 17-19.

A claimant's statements of symptoms alone are not sufficient to establish the existence of

a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL

5180304.   When a claimant alleges impairment-related symptoms, such as pain, a two-step

process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable

physical or mental impairment that could reasonably be expected to produce the claimant's

symptoms, e.g., pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.

Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id.* at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

The ALJ stated the following regarding Peacock's subjective allegations of pain:

> In terms of the claimant's alleged back impairments, the record undoubtedly evidences that claimant consistently complains of pain in his back.  However, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

Tr. 43.

Peacock argues that the ALJ misread the evidentiary record when assessing Peacock's pain and painted "a far better" or "rosier" picture as to the extent of the limitations relating to Peacock's pain than the evidence supports.  Doc. 16, pp. 17-19.  Thus, Peacock seeks reversal and remand for further evaluation.

First, Peacock argues that the ALJ's finding that Peacock "was maintained with physical therapy and injections from late 2017 through mid-2019, when he began [RFA], without indication of lack of benefit[]" (Doc. 16, p. 18 (citing Tr. 42))[13] is an inaccurate reading of the evidence.   Initially, the Court observes that the ALJ cites to no records to support this conclusion.  Moreover, Peacock points to evidence reflecting that the relief that Peacock reported from injections was very short-lived, i.e., no more than one day of relief, and following an RFA procedure in May 2016, Peacock reported no relief at all.  Doc. 16, p. 18 (citing Tr. 298, 318, 322, 324, 328).  Also, Peacock points out that the evidence reflects that he did not really get relief from physical therapy.  Doc. 16, p. 18 (citing Tr. 343).

Although some of the records cited to by Peacock are from treatment that pre-dates his alleged onset date of June 23, 2016, the evidence reflecting lack of relief from physical therapy is from an August 3, 2017, visit with Dr. Ryan and there is evidence from a September 16, 2016, visit with Dr. Gurley indicating that Peacock's "injection therapy did not lead to any significant or sustained improvement in his symptoms."  Tr. 376.  Also, in December 2018, Peacock relayed

---

[13] This excerpt is found at Tr. 43 not Tr. 42.

to Dr. Hedaya that he had tried physical therapy multiple times and it "help[ed] somewhat but not enough[]" and he "[h]ad ablation before surgery which did not help[.]"  Tr. 832.

Second, Peacock argues that the ALJ's conclusion that "[n]o muscle spasms or atrophy were ever present" is error.  Doc. 16, p. 19 (citing Tr. 43).  The Court agrees.  As the record reflects, physical examination findings included evidence of spasms.  Tr. 345 (Dr. Ryan's August 3, 2017, office visit physical examination findings included "[s]pasm thoracic paravertebral spine); Tr. 346 (Dr. Ryan's August 3, 2017, office visit, reflecting a diagnosis of "[s]pasm of thoracic back muscle[,]" with the following observation noted: "very tense and has spasm in the thoracic area[]").   Also, as noted by Mr. Zillmann in his FCE report,  the primary reason Peacock was unable to meet the sitting and standing minimum periods of time was due to his inability "to stay in position without increased pain or spasms."  Tr. 425.

Third, Peacock argues that the ALJ's finding that Peacock "'frequently reported increasing improvement in symptoms (*see*, 4F)[]'" is "a rosier picture than the evidence suggests."  Doc. 16, p. 19 (discussing ALJ's findings at Tr. 43).  The Court tends to agree.  For example, even a year after Dr. Gurley performed the fusion surgery in November 2016, Peacock's pain level on average was still between a 4 and 5 out of 10. Tr. 362.  Also, while Dr. Gurley noted that "[f]rom a pain and functional standpoint [Peacock] had achieved some improvement[,]" and Peacock now had more good days than bad day, Peacock continued "to experience pain in the thoracolumbar, lumbar, lumbosacral regions[] [and] [Peacock] also describe[d] significant limitations in his ability to sit for any sustained period of time[.]"  Tr. 362.  Additionally, while Peacock may not have needed to return for orthopedic services following his November 2016 surgery, the record reflects that Peacock continued to treat with

... 

pain management specialists in 2018 and 2019.  *See e.g.,* Tr. 824, 832, 956 (Integrative Pain Care, LLC treatment records).

The Commissioner contends that the ALJ's assessment of Peacock's pain is sufficiently supported by substantial evidence because the ALJ relied upon the generally minimal clinical examination findings.  Doc. 18, p. 13.  However, as noted above, the ALJ's consideration of the evidence in this regard is not wholly supported, i.e., the ALJ incorrectly found there was no evidence of spasms.

The Commissioner also argues that "the ALJ considered Plaintiff's robust daily activities in light of his allegations of pain."  Doc. 18, p. 13 (citing Tr. 44).  However, the ALJ's notation of Peacock's daily activities was made in connection with his consideration of the FCE conducted by Mr. Zillmann, not when assessing Peacock's subjective complaints of pain.  Tr. 44.  Even assuming the ALJ considered those activities when assessing Peacock's subjective allegations, the activities identified by the ALJ are not necessarily "robust" as the Commissioner describes them.  Rather, the activities noted by the ALJ consist of Peacock walking his dog and caring for his children.  Tr. 44 (citing Exhibit 6F (Tr. 418-423 (psychological consultative examiner's evaluation)).  Other activities referenced by the Commissioner to support the ALJ's finding that Peacock's pain was not as disabling as alleged, e.g., exercising, shopping, were not noted by the ALJ as reasons for finding Peacock's pain not as disabling as alleged.

In sum, while an ALJ is not required to discuss every piece of evidence, considering the foregoing evidence that the ALJ either overlooked or misconstrued, the Court is unable to assess whether the ALJ's assessment of Peacock's pain is supported by substantial evidence.  Accordingly, notwithstanding the Commissioner's arguments to the contrary, the Court finds that

reversal and remand is necessary in order for the ALJ to provide a more thorough analysis of the evidence as it pertains to Peacock's subjective allegations regarding his pain.

**C.     Other issue on appeal**

Peacock also argues that the ALJ erred when reviewing the opinion evidence and concluding that the evidence supported a light RFC.[14]  Doc. 16, pp. 20-23. The Court declines to address Peacock's additional argument because, on remand, the ALJ will reassess Peacock's subjective statements regarding his pain and that assessment may impact the ALJ's findings regarding the persuasiveness of the opinion evidence and/or the ALJ's finding that Peacock has the RFC to perform his past relevant work.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES AND REMANDS** the Commissioner's decision for further proceedings consistent with this opinion and order.

Dated: September 27, 2021

/s/ *Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

---

[14] Peacock's claim was filed after March 27, 2017.  Thus, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.